**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **STELLA VELEZ-SANTIAGO** | : | **CIVIL ACTION** |
| | : | |
| | : | |
| **v.** | : | **NO. 24-6383** |
| | : | |
| **CAMPBELL'S SOUP COMPANY, et al.** | : | |
| | : | |
| | : | |

# MEMORANDUM OPINION

**Henry, J.** **July 27, 2026**

Pending before the Court is Defendants Campbell's Soup Company, Pepperidge Farm Incorporated, and Sherrie Cook's Motion for Summary Judgment (ECF No. 21) ("Mot."). This case arises out of Plaintiff Stella Velez-Santiago's termination from employment by Defendants, which she alleges was discriminatory on the basis of her race. Plaintiff brings claims for violation of Title VII against Campbell's Soup Company and Pepperidge Farm, Incorporated (Count I); violation of the Pennsylvania Human Relations Act (the "PHRA") against all Defendants (Count II); and Violation of the Civil Rights Act, 42 U.S.C. § 1981, against all Defendants (Count III).

Because I find that there are questions of fact as to whether certain co-workers who were involved in the incident leading to Plaintiff's termination but who were not members of Plaintiff's protected class are considered similarly situated to Plaintiff, I will deny the Motion for Summary Judgment.

## I. BACKGROUND

Plaintiff, an African American woman, began employment with Defendants in 2017. *See* ECF No. 23-1 (Plaintiff's Statement of Disputed Material Facts) ("Pl. SOF") ¶ 2. Defendant Pepperidge Farm Incorporated ("Pepperidge Farm") is a commercial bakery owned by Defendant

The Campbell's Company. *See* ECF No. 21-2 (Defendants' Statement of Undisputed Material Facts) ("Def. SOF") ¶ 3. Pepperidge Farm manufactures and distributes a variety of baked goods and operates a manufacturing plant in Denver, Pennsylvania. *Id.* ¶¶ 3-4. Defendant Sherrie Cook is the former Employee Relations Manager at Pepperidge Farm's Denver plant. *Id.* ¶ 4.

**a. Plaintiff's Job Responsibilities**

Plaintiff was hired to work at Pepperidge Farm's Denver plant as a temporary employee in 2017, and she became a full-time employee in July 2018. Pl. SOF ¶ 2. Her full-time position was initially as a substitute General Bakeshop Helper ("GBH"). Def. SOF ¶ 5. As a substitute GBH, she worked in the packaging department and was trained on six packaging lines, which included training on lock-out tag-out ("LOTO") procedure, described in more detail below. Pl. SOF ¶ 6; ECF No. 28 (Defendants' Response to Plaintiff's Statement of Disputed Facts) ("Def. Opp. to Pl. SOF") ¶¶ 2, 6.

Then, in March 2021, Plaintiff was awarded the position of Machine Operator/Depositor for Line 1 in the Denver plant's processing area. Def. SOF ¶ 6. She held that position until her employment was terminated on July 28, 2023. *Id.* ¶ 8. As a Machine Operator/Depositor for Line 1, Plaintiff's role was to ensure that cookies were in good shape before they proceeded to the oven. *Id.* ¶ 9. She was trained on Lines 1 and 2 in the processing department, but she was not trained on other lines, despite her requests to be trained on all processing lines. Pl. SOF ¶¶ 8, 28; Def. Opp. to Pl. SOF ¶¶ 8, 28. The Line 1 machine Plaintiff worked on regularly was control reliable, which means that certain maintenance tasks could be completed on that machine without first applying LOTO to it. Pl. SOF ¶ 5; Def. Opp. to Pl. SOF ¶ 5.

**b. LOTO Procedure**

LOTO is a safety procedure by which employees de-energize and lock out equipment before performing any work inside the machinery. Def. SOF ¶ 14. It is one of Pepperidge Farm's

Critical Safety Rules that applies universally to all machines, unless those machines are control reliable and do not require LOTO. Def. SOF ¶ 16; ECF No. 23-2 (Plaintiff's Responses to Defendants' Statement of Undisputed Material Facts) ("Pl. Opp. to Def. SOF") ¶ 16. Pepperidge Farm's Critical Safety Rules, effective August 1, 2022, provide that the following are violations of LOTO policy: "Performing work on equipment without properly de-energizing and lockout out [sic] equipment. This includes, but is not limited to, working inside equipment with guards or covers removed, thus exposing mechanical and electrical hazards;" "Unauthorized removal of a lockout lock or tag in a 'Tagout Only' operation;" and "Reaching into any point of operation with any body part." Def. SOF ¶¶ 18, 21; Pl. Opp. to Def. SOF ¶ 18; ECF No. 21-5 ("Def. Ex. 3") at 60. The Critical Safety Rules Accountability Matrix further provides that those named violations, in addition to "[f]ailure to comply with Lock Out Program and procedures," "[f]ailure to lock out," "[u]sing a co-worker's lock," "[r]emoving a co-worker's lock without authorization," and "[l]ack of key control" are LOTO violations, all of which result in termination of employment upon first occurrence, unless there are extenuating or mitigating circumstances, in which case an employee may be suspended. Def. SOF ¶ 21; Def. Ex. 3 at 62. There is no document that lists what such mitigating or extenuating circumstances might be, but the decision as to what constitutes mitigating or extenuating circumstances is within the discretion of the company. Def. Opp. to Pl. SOF ¶ 97.

The parties dispute whether Plaintiff was ever provided with or saw a summary of the Critical Safety Rules while employed at Pepperidge Farm. Def. SOF ¶ 25; Pl. Opp. to Def. SOF ¶ 25. However, it is undisputed that Plaintiff signed a document on October 6, 2020 acknowledging her understanding of a "Lockout Safety Talk." Def. SOF ¶ 26. That document stated that employees were required to LOTO any time they place any part of their body in harm's way and any time they are exposed to hazardous energy. *Id.* ¶ 28. It also described group lockout rules:

When more than one employee services the same equipment requiring LOTO, each employee must attach their own lock to a hasp before starting work. *Id.* ¶ 29.

On May 6, 2022 and later on June 29, 2023, Plaintiff signed a document acknowledging review of the Denver Plant Safety Rules, which provided that employees should "never reach into machinery or bypass equipment guarding" and "follow specific lockout procedures when working on machinery." *Id.* ¶¶ 33-34; Pl. Opp. to Def. SOF ¶¶ 33-34. On April 8, 2022, Plaintiff signed acknowledgment of review of a "Machine Interaction/Reaching In Safety Talk" document, which identified certain safety guidelines, including that employees should "[u]se tools (such as scrapers, push sticks, and tongs) to clear jams on energized equipment," that "[r]eaching into energized equipment with your hand is strictly prohibited," and that employees should "[f]ollow lockout/control reliable guidelines" and "[n]ever reach into de-energized equipment without control reliable or lockout use." Def. SOF ¶¶ 35-36; Pl. Opp. to Def. SOF ¶¶ 35-36; Def. Ex. 3 at 27.

**c. The July 17, 2023 Incident**

On July 17, 2023, Plaintiff was working at the Denver Plant when an employee operating a Line 4 machine, Deborah Dillow,[1] radioed for assistance with a broken wire on Line 4. Def. SOF ¶ 40. Plaintiff went to assist Ms. Dillow with the broken wire on Line 4, which was a practice encouraged by Plaintiff's supervisor, Jacob Maier, so long as assistance was appropriate. Def. SOF ¶ 41; Pl. SOF ¶¶ 13, 16; Def. Opp. to Pl. SOF ¶ 16. When Plaintiff got there, another employee, Eid Saad,[2] was already at Line 4 assisting Ms. Dillow by inserting a long tool called a scraper into

---

[1] Ms. Dillow was employed by Pepperidge Farm for almost 40 years. Def. Opp. to Pl. SOF ¶ 27. She previously held the position of a substitute GBH in processing. *Id.* She was trained on the Lines 2, 3, 4, 5, and 6 depositor machines. Pl. SOF ¶ 26.

[2] Mr. Saad was a substitute GBH in the processing department. Def. Opp. to Pl. SOF ¶ 41. He was trained on the Lines 2, 3, 4, 5, and 6 depositor machines. *Id.*

the machine. Def. SOF ¶¶ 42, 46. Mr. Saad did not LOTO before using the scraper. Pl. SOF ¶ 38. Ms. Dillow had locked out one of the two Line 4 switches by the time Plaintiff arrived, but Plaintiff did not see her do so. *Id.* ¶¶ 14, 36. Despite walking past a placard stating that machine's LOTO policy on her way to assist Ms. Dillow—although Plaintiff alleges she did not see this placard—Plaintiff assumed the machine was control reliable and did not apply her lock to the Line 4 machine. Def. SOF ¶¶ 48-50; Pl. SOF ¶ 14; Pl. Opp. to Def. SOF ¶ 50. She proceeded to stick her arm into the machine to assist Ms. Dillow with the broken wire. Def. SOF ¶¶ 48-50. This incident was captured on surveillance footage, which Safety Coordinator Jennifer Feist discovered while investigating a separate incident. Def. SOF ¶¶ 12, 54; Pl. SOF ¶ 55.

Defendant Cook led Pepperidge Farm's investigation of the July 17, 2023 incident, assisted by Ms. Feist. Def. SOF ¶ 55. Ms. Cook called Plaintiff into her office on July 24, 2023, and Plaintiff admitted to Ms. Cook that she did not apply her lock to Line 4 before assisting Ms. Dillow, although Plaintiff stated that that was because she did not know she needed to LOTO. Def. SOF ¶ 56; Pl. Opp. to Def. SOF ¶ 56; Pl. SOF ¶ 19. Plaintiff explained to Ms. Cook that she was not trained on the Line 4 machine and that she had never seen a helper LOTO on Line 4. Pl. SOF ¶¶ 19, 87. Ms. Cook told Plaintiff that she had violated LOTO policy and was therefore being suspended. *Id.* Plaintiff asked Ms. Cook why Ms. Dillow and Mr. Saad were not being suspended as well, and Ms. Cook told her not to worry about them. *Id.* ¶ 19.

A committee of Pepperidge Farm employees, including Plant Manager Gerald Kreider, Plant Manager Christine Martin, Safety Manager Steve Whitson, Ms. Feist, and Ms. Cook reviewed the information gathered during the investigation of Plaintiff. Def. SOF ¶¶ 55, 69. Having concluded that Plaintiff violated LOTO policy, Martin prepared and sent a memorandum to Kreider on July 27, 2023, recommending Plaintiff's termination. *Id.* ¶ 71. Pepperidge Farm recommended her termination for a first offense LOTO violation, and her employment was

terminated on July 28, 2023. *Id.* ¶¶ 72, 81. When Ms. Cook called Plaintiff to terminate her employment, Plaintiff expressed concern that she was being terminated for helping another employee on a machine on which she was not trained, and that the other employees involved in the same incident also did not follow LOTO policy but were not disciplined. Pl. SOF ¶ 90.

Pepperidge Farm concluded that Ms. Dillow and Mr. Saad, both of whom are white, did not violate LOTO policy during the July 17, 2023 incident. Def. SOF ¶ 77; Pl. SOF ¶ 94. During an interview conducted as part of the investigation, Ms. Dillow told Ms. Feist that she applied her lock to one of the Line 4 machine's two switches before beginning work on the broken wire. Def. SOF ¶ 60; Pl. Opp. to Def. SOF ¶ 60. Ms. Feist showed Ms. Dillow how she could lock out both switches but concluded that Ms. Dillow applied her lock in compliance with Pepperidge Farm's Critical Safety Rules. Def. SOF ¶ 62; Pl. SOF ¶ 62. Mr. Saad was never interviewed about the incident. Pl. SOF ¶ 49.

## II. LEGAL STANDARD

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court draws all inferences in favor of the nonmoving party. *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004).

## III. ANALYSIS[3]

Race discrimination claims pursuant to Title VII, Section 1981, and the PHRA are analyzed pursuant to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, (1973). *McDonnell Douglas* requires the plaintiff to first establish a prima facie case of discrimination. The burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* Finally, the plaintiff must show that the defendant's proffered reasons were pretext for discrimination. *Id.*

### a. Plaintiff's Prima Facie Case

To establish a prima facie case of discrimination, "[a] plaintiff must show that: 1) [she] is a member of a protected class, 2) [she] was qualified for the position [she] sought to attain or retain, 3) [she] suffered an adverse employment action, and 4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Vaughan v. Boeing Co.*, 733 F. App'x 617, 622 (3d Cir. 2018).

The parties do not dispute the first two elements—that Plaintiff, an African American woman, is a member of a protected class and that she was qualified for the position in which she was employed. The parties also do not dispute that Plaintiff's suspension and subsequent termination qualify as adverse employment actions. However, the parties do dispute whether Plaintiff's lack of training on the Line 4 machine constitutes an adverse employment action. They also dispute whether Plaintiff's suspension, termination, and—if it does constitute an adverse action—lack of training on the Line 4 machine occurred under circumstances giving rise to an inference of discrimination.

[3] All claims will be discussed together, as analysis under Title VII and the PHRA is identical, *see Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 n.2 (3d Cir. 2009), and "the substantive elements of an employment discrimination claim brought under § 1981 are identical to those brought under Title VII," *Greer v. Mondelez Glob., Inc.*, 590 F. App'x 170, 172 n.4 (3d Cir. 2014).

**i. Failure to Train**

The parties first dispute whether Defendants' denial to train her on Line 4—the line upon which she was working when she committed the LOTO violation that resulted in her suspension and termination—constitutes an adverse employment action. Plaintiff claims that she had not been trained on the Line 4 depositor machine despite numerous requests to her supervisor to be trained. *See* ECF No. 23 (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment) ("Opp."). at 6. She contends that Ms. Dillow and Mr. Saad, both of whom are white, were treated more favorably than her in that they were trained on depositor Line 4. *Id.*

An adverse employment action is defined as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Pagan v. Gonzalez*, 430 F. App'x 170, 172 (3d Cir. 2011) (internal quotation omitted). In order for denial of training to constitute an adverse employment action, there must be a "clear nexus between the denial of training and the employee's ability to perform [her] job functions, receive pay increases, or advance [her] career." *Smith v. Spencer*, No. 16-cv-2157, 2020 WL 9889206, at *4 (M.D. Pa. Jan. 31, 2020), *report and recommendation adopted sub nom. Smith v. Modly*, No. 16-cv-2157, 2020 WL 9889196 (M.D. Pa. Mar. 23, 2020), *aff'd sub nom. Smith v. Sec'y United States Navy*, 843 F. App'x 466 (3d Cir. 2021).

Defendants first dispute whether failure to train constitutes an adverse employment action in these circumstances. Defendants argue that Plaintiff cannot set forth a claim that Defendants' failure to train her on Line 4 constituted an adverse action because she testified that she did not suffer any discrimination prior to her termination. *See* ECF No. 27 (Defendants' Reply Memorandum of Law in Further Support of Their Motion for Summary Judgment ) ("Reply") at 5. In other words, since Plaintiff had testified that nothing else happened prior to her termination that she felt was racially discriminatory, and training on Line 4 by necessity would have happened

prior to her termination, then any failure to train her on Line 4 could not have been discriminatory. *Id.* Further, and, in this Court's opinion, more persuasively, Defendants argue that denial of training on Line 4 does not constitute an adverse employment action where, as here, Plaintiff *was* trained on LOTO procedure, which applied to all energized machines on the production floor. *Id.* Defendants submit that there is no evidence that had Plaintiff been trained on Line 4, she would not have committed the LOTO violation that led to her termination, defeating the requisite nexus between the denial of training and Plaintiff's termination. *Id.*

In order to constitute an adverse employment action, failure to train Plaintiff on depositor Line 4 would need to result in a significant change in her employment status. Plaintiff has not presented evidence to show, for example, that had she been trained on the Line 4 depositor machine, she would have been promoted, reassigned with significantly different responsibilities, or had a significant change in benefits. At best, Plaintiff argues that, had she been trained on depositor Line 4, she would have known how to properly LOTO that machine and the incident on July 17 leading to her termination would not have occurred.

The parties do not dispute that Plaintiff was trained on LOTO. *See, e.g.* Def. SOF ¶ 37; Pl. Opp. to Def. SOF ¶ 37; Def. SOF ¶ 73; Pl. Opp. to Def. SOF ¶ 73.[4] Rather, Plaintiff refutes the sufficiency of her training by raising the fact that she was not trained on the Line 4 depositor machine. But Defendants have presented sufficient evidence to show that the LOTO training applies universally to all machinery, *see, e.g.*, Def. SOF. ¶ 16, and Plaintiff has not presented any evidence to show that her LOTO training did not apply to Line 4.[5] Because there is no material

[4] Plaintiff does not specifically deny that Plaintiff was trained on universal LOTO policy, but only that she was not specifically trained on Line 4.

[5] Plaintiff denies Defendants' assertion that "LOTO is a Critical Safety Rule that applies universally to all machinery at the Denver plant," but refutes it only with her assertion that Line 1 did not require LOTO because it was control reliable. Pl. Opp. to Def. SOF ¶ 16.

dispute of fact as to whether Plaintiff was trained on LOTO, and Plaintiff has not presented evidence to show that had she been trained on Line 4 in addition to her LOTO training, she would not have committed the LOTO violation that resulted in her suspension and termination, it cannot be said that any denial of training on Line 4 constitutes an adverse employment action.

But even if the Court were to consider denial of training on Line 4 an adverse employment action, there is no genuine dispute of material fact as to whether that denial occurred for discriminatory reasons. Plaintiff points only to Ms. Dillow and Mr. Saad in an attempt to show that other employees comparable to Plaintiff but not in her protected class received training on Line 4. Opp. at 6. Defendants assert that, with respect to training on Line 4, Ms. Dillow and Mr. Saad cannot be considered comparators to Plaintiff. Reply at 6. Perhaps most persuasively, as Defendants point out and Plaintiff does not seem to dispute, Ms. Dillow and Mr. Saad were specifically assigned to operate Lines 2 through 6 when they held their roles as substitute GBH in the processing department. *See* Def. Opp. to Pl. SOF ¶ 8. Plaintiff has not presented evidence that she was ever assigned to operate the Line 4 depositor machine or that her job requirements necessitated such operation, making her distinguishable from Ms. Dillow and Mr. Saad. Additionally, the parties do not dispute Mr. Maier's testimony that the machines an employee is trained on depend on factors such as their job position and how long they had been in the job. Def. Opp. to Pl. SOF ¶ 8. It is undisputed that Ms. Dillow and Mr. Saad were substitute GBHs in processing, which required training on Lines 2 through 6, and Plaintiff was a Machine Operator/Depositor for Line 1 and previously a substitute GBH in packaging, which did not require such training on the Lines 2 through 6 depositor machines. Def. Opp. to Pl. SOF at ¶¶ 27, 41. Therefore, that Mr. Saad and Ms. Dillow received training on the Line 4 depositor machine but Plaintiff did not is explained by the differences in their job responsibilities and does not give rise

to an inference of discrimination. As such, Plaintiff has not established a prima facie case for discrimination based on her denial of training on the Line 4 depositor machine.

**ii. Suspension and Termination**

As to Plaintiff's suspension and termination following the July 17 incident, the parties dispute only whether the suspension and termination arose under circumstances giving rise to an inference of discrimination. Plaintiff alleges that her suspension and termination were discriminatory because the two other employees involved in the July 17, 2023 incident, Ms. Dillow and Mr. Saad, both of whom are white, committed LOTO violations similar to Plaintiff's but were not disciplined or terminated. Opp. at 6. Defendants' contend that Ms. Dillow and Mr. Saad did not commit any safety violations during the July 17, 2023 incident, so they cannot properly be considered comparators for the purpose of showing that Plaintiff's treatment following the incident was discriminatory. Mot. at 14-15.

"A plaintiff may support an inference of discrimination by showing that 'similarly situated' employees who were not in a protected class were treated more favorably." *Butler v. Arctic Glacier USA*, 213 F. Supp. 3d 711, 716 (E.D. Pa. 2016) (citing *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 170 (3d Cir. 2013)). "In disciplinary cases or in the context of personnel actions, for example, the relevant factors often include a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Houston v. Easton Area Sch. Dist.*, 355 F. App'x. 651, 654 (3d Cir. 2009) (internal quotations omitted). In other words, the employee receiving more favorable treatment must be similarly situated "in all *relevant* respects." *Id.* (emphasis in original). Although sufficiency of evidence of comparators is "typically an issue of fact for the jury, a court may

nonetheless grant summary judgment if no reasonable jury could find that the individuals identified by the plaintiffs were similarly situated." *Hampshire v. Bard*, 793 F. App'x 75, 80 (3d Cir. 2019).

As an initial matter, Plaintiff argues that she, Ms. Dillow, and Mr. Saad had the same supervisor on July 17, 2023, Mr. Maier, and the incident was investigated by the same committee of individuals, and therefore, they should be considered comparators. Opp. at 10. Although this is one factor the Court may consider, *see Houston*, 355 F. App'x. at 654, more is needed. The Court will look at the specific circumstances giving rise to Plaintiff's suspension and termination—and Mr. Saad and Ms. Dillow's lack thereof—to determine whether Mr. Saad and Ms. Dillow are similarly situated.

**a. Mr. Saad**

The parties do not dispute that Mr. Saad was assisting Ms. Dillow on Line 4 when Plaintiff arrived to Line 4. Def. SOF ¶ 42, Pl. Opp. to Def. SOF ¶ 42. They also do not dispute that Mr. Saad did not lock out Line 4. Pl. SOF ¶ 46; Def. Opp. to Pl. SOF ¶ 46. Defendants state that "[w]hen Plaintiff got to Line 4, Saad was assisting Dillow on Line 4 by inserting a long tool, also called a scraper, into the machine." Def. SOF ¶ 46. Plaintiff does not dispute the fact that Mr. Saad did indeed insert a scraper into Line 4, but rather that "Saad was still required to LOTO the machine before working on it, even if he was using an object to work in the machine." Pl. Opp. to Def. SOF ¶ 46.[6]

The key factor here is whether there is any genuine dispute of material fact as to whether Mr. Saad committed a LOTO violation on July 17, 2023 when he reached into the Line 4 machine

[6] Although Plaintiff asserts that Mr. Saad testified at one point in his deposition that "he did not use any object to go into the machine to remove anything," she also points out that "his testimony is contradicted by the video produced by Defendants," which shows an individual using a long spatula-like tool inside of a machine. Pl. SOF at ¶ 47. Defendant clarifies that, at a different point in his deposition, Mr. Saad *did* testify that he used a spatula to remove dough from the machine, consistent with the video. Def. Opp. to Pl. SOF ¶ 47. Therefore, there does not seem to be a genuine dispute that Mr. Saad used a scraper in the machine.

using a scraping tool. If he did, he would be considered a comparator to Plaintiff who was treated more favorably in that he was not suspended or terminated following the incident. But if there is no evidence by which a reasonable jury could determine he committed a LOTO violation—*i.e.*, the evidence is clear that LOTO is not required on the Line 4 machine when using a scraper—then he cannot be considered a comparator because he was properly not suspended or terminated.

According to Defendants, LOTO is not required when an employee inserts a scraper or other tool into an energized machine, rather than a body part. In support of this, Defendants rely on deposition testimony from Ms. Feist, Ms. Cook, and Plaintiff, as well as a document entitled "Machine Interaction/Reaching In Safety Talk." Def. SOF ¶ 76. Ms. Feist and Ms. Cook both testified at their depositions that they watched a video of the July 17 incident, in which they observed Mr. Saad using a scraper on the Line 4 machine, and that although they did not see him LOTO, there was no need for him to LOTO when using a scraper on that machine. ECF No. 21-6 (Def. Ex. 4) ("Feist Dep.") 78:14-79:9; ECF No. 21-4 (Def. Ex. 2) ("Cook Dep.") 15:16-16:5.

The "Machine Interaction/Reaching In Safety Talk" document, dated April 2, 2022, provides as a guideline that employees should "[u]se tools (such as scrapers, push sticks, and tongs) to clear jams on energized equipment." Def. Ex. 3 at 27. The parties do not dispute that "LOTO refers to de-energizing and locking out equipment before performing any work inside the machinery." Def. SOF. ¶ 14; Pl. Opp. to Def. SOF ¶ 14. Thus, and as Plaintiff acknowledged in her deposition, "energized equipment" means equipment that has not been LOTO'd. *See* ECF No. 21-3 (Def. Ex. 1) ("Pl. Dep.") 143:14-18. This, Defendants say, is further evidence that Mr. Saad did not need to LOTO before working on the Line 4 machine, and he therefore did not commit a safety violation when he did not LOTO. Mot. at 13-14.

Plaintiff argues that Mr. Saad was required to LOTO, and therefore, he committed a safety violation when he failed to do so during the July 17 incident. Opp. at 8. In support of this, she

refers to her own deposition testimony, in which she testified that she saw him "taking an object into the machine on the operator side, so he should have locked out, tagged out according to the Campbell's or Pepperidge Farm safety policy." *Id.*; Pl. Dep. 140:16-19. She testified that in the training she received, employees LOTO "before reaching in any way into any machines that required" LOTO, including use of a tool. *Id.*140:24-141:5. She could not point to any documentation that provided such a rule. *Id.* 141:13-15.

The issue is thus whether Plaintiff's testimony that she was trained that LOTO was required even to use a tool inside a machine is sufficient to create a genuine issue of fact. "[A] single, non-conclusory affidavit or witness's testimony, when based on personal knowledge and directed at a material issue, is sufficient to defeat summary judgment, even when self-serving." *Daimler v. Moehle*, No. 23-cv-2611, 2025 WL 1355138, at *4 (3d Cir. May 9, 2025) (internal quotations omitted). But "conclusory testimonial evidence cannot defeat summary judgment." *Id.* (citing *Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 263 (3d Cir. 2012)). "Testimonial evidence is conclusory if it fails to set 'forth specific facts that reveal a genuine issue of material fact' or sets forth opinions and conclusions rather than specific factual assertions." *Id.* (quoting *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009)).

Plaintiff's assertion that her training required LOTO before reaching into a machine with an object, although otherwise uncorroborated, is sufficient to raise a genuine dispute of a material fact as to LOTO policy. *See Daimler*, 2025 WL 1335138, at *5 ("[T]here is no obligation to corroborate self-serving testimonial evidence to survive summary judgment."). Therefore, there is a genuine issue of fact as to whether Mr. Saad violated LOTO policy by reaching into the Line 4 depositor machine with a scraper without de-energizing the machine.

**b. Ms. Dillow**

The parties do not dispute that Ms. Dillow was the employee operating Line 4 who radioed for assistance with a broken wire on July 17, 2023. Def. SOF. ¶ 40; Pl. Opp. to Def. SOF ¶ 40. The parties also do not dispute that Ms. Dillow applied a lock to one of the two switches on Line 4. Def. SOF ¶ 60; Pl. Opp. to Def. SOF ¶ 60; Pl. SOF ¶ 37; Def. Opp. to Pl. SOF ¶ 37. The dispute is whether Ms. Dillow was required to lock out both disconnects to the machine in order to change the broken wire. If she was required to apply two locks, then her conduct on July 17 might well have been a safety violation. If she was not required to apply two locks, then her conduct on July 17 was not a safety violation and she could not be considered a comparator to Plaintiff.

Plaintiff contends that Ms. Dillow did not properly lock out the Line 4 machine because two locks were required, and Ms. Dillow only applied one lock. Opp. at 7. In support of this, Plaintiff relies on Ms. Dillow's testimony that a complete lockout of the Line 4 machine required a lockout of both switches, but she had only locked out one switch. ECF No. 23-3 at Ex. C ("Dillow Dep.") 42:2-9. Plaintiff also testified in her deposition that Ms. Dillow told Plaintiff she did not properly LOTO on July 17 and asked Plaintiff to cover for her if Plaintiff was questioned about Ms. Dillow's conduct. Pl. SOF ¶ 20; Def. Opp. to Pl. SOF ¶ 20.

Plaintiff further relies on Ms. Feist's deposition testimony with regard to her interview with Ms. Dillow about the incident. Plaintiff posits that "Feist admitted that when she interviewed Dillow, she discovered that Dillow did not completely lock out L4 on the day of this incident because Dillow only locked out the left disconnect switch and not the right, and Feist had to show Dillow how Dillow should have properly locked out both switches with one lock." Pl. SOF. ¶ 62. Defendants contend that Ms. Feist's testimony was not that Ms. Dillow improperly locked out, but only that she did not know how to lock out both switches—an irrelevant fact because only one lock was required. Reply at 3.

A look at Ms. Feist's testimony is necessary to determine which party—if any's—characterization is correct. Ms. Feist testified that, when she asked Ms. Dillow about the incident, Ms. Dillow showed her both lockout points on the Line 4 machine. Feist Dep. 45:7-18. Ms. Dillow then demonstrated one lockout for Ms. Feist. *Id.* 45:24-46:3. Ms. Feist asked Ms. Dillow if she had a second lock, to which Ms. Dillow replied that she did not. *Id.* 46:4-12. Ms. Feist then asked Ms. Dillow how she would lock out both locks, to which Ms. Dillow answered referring to a community lock on Line 6. *Id.* 46:13-22. Then, Ms. Dillow applied her lock to the left switch, and, referring to the right disconnect, said "I don't think you can lock this one out." *Id.* 46:23-47:4. Ms. Feist then showed Ms. Dillow how to maneuver her lockout device through the right disconnect. *Id.* 48:8-17. Ms. Feist acknowledged in her deposition that Ms. Dillow did not lock out both locks on Line 4, but that Dillow was "only working with the mechanism for the blade cut and that's the one on the left that she did lock out." *Id.* 48:22-49:7.

Neither party has presented sufficient evidence for the Court to determine at this point whether Ms. Dillow's conduct—locking out only the left lock, where the part of the machine being worked on was on the left—constitutes a LOTO violation. That Ms. Dillow subjectively believed she committed a LOTO violation does not establish that she indeed committed one. And Ms. Feist's testimony, interpreted in the light most favorable to the non-moving party, cannot be said to unequivocally establish that Ms. Dillow did not commit a LOTO violation. Therefore, I hold that there is a genuine dispute of fact as to whether Ms. Dillow committed a LOTO violation and would therefore be considered a comparator to Plaintiff for the purposes of showing discrimination.

Because I hold that at this stage, there is a question of fact as to whether Mr. Saad and Ms. Dillow are comparators with Plaintiff such that their lack of termination for potential LOTO violations shows that they were treated more favorably than Plaintiff, summary judgment cannot

be granted on the basis of Plaintiff's failure to show a prima facie case of discrimination. The burden therefore will shift to Defendants to show that, even if Plaintiff were to establish a prima facie case of discrimination, they had a legitimate, non-discriminatory reason for her termination.

**b. Defendants' Reason for Terminating Plaintiff**

Even were Plaintiff to present sufficient evidence to establish a prima facie case of race discrimination, Defendants have established that they had a legitimate, non-discriminatory reason for terminating Plaintiff's employment. The burden on a defendant to produce such a reason is "relatively light." *See Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Id.* (emphasis in original).

Defendants present a legitimate, non-discriminatory reason for terminating Plaintiff—her LOTO violation, which she admitted to committing, and which Defendants investigated and determined was grounds for termination. Mot. at 19. And Defendants have presented evidence that termination of employment is the proper sanction for violation of LOTO policy, absent extenuating or mitigating circumstances. *See* Def. SOF. ¶ 24; Def. Ex. 3 at 62.

**c. Pretext**

Because Defendants have shown a legitimate, non-discriminatory reason for Plaintiff's termination, the burden shifts back to Plaintiff to show that Defendants' articulated reason is mere pretext for discrimination. Plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. "[T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons

must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons . . . was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Id.*

Plaintiff makes the conclusory argument that "a jury can disbelieve Defendants' reason for not terminating Dillow and Saad relating to the July 17, 2023, incident, but then suspended and then terminated Plaintiff." Opp. at 12. But this is insufficient—the Third Circuit has rejected the notion "that the plaintiff can avoid summary judgment simply by arguing that the factfinder need not believe the defendant's proffered legitimate explanations." *Fuentes*, 32 F.3d at 764.

As to Defendants' decision not to discipline Ms. Dillow and Mr. Saad, Plaintiff argues that "[a] reasonable jury could also find that Defendants' assertion that they did not discipline Dillow and Saad . . . because they did not violate the LOTO rules is false." Opp. at 12. In reply, Defendants contend that Plaintiff mischaracterizes evidence to conclude that Ms. Dillow and Mr. Saad violated LOTO policy. Reply at 7. As explained above, there is a question of fact as to whether Ms. Dillow and Mr. Saad did indeed violate LOTO policy. Shortly after the incident, Defendants concluded that they had not violated any safety policy. But that is not conclusive at this point. Plaintiff has provided evidence sufficient to cast doubt on Defendants' conclusion that Ms. Dillow and Mr. Saad did not commit LOTO violations. If the finder of fact concludes that they did in fact commit LOTO violations, then a reasonable fact finder might similarly find that Defendants' decision to terminate Plaintiff's employment because of her similar LOTO violation was pretext for a discriminatory motive. *See Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 322 (3d Cir. 2000) ("A violation of company policy can constitute a pretext for unlawful discrimination if others similarly situated also violated the policy with no adverse consequence.").

Next, Plaintiff argues that Defendants' internal investigation of the incident was flawed in that it should have found that mitigating or extenuating circumstances existed that should have

reduced her discipline from termination to suspension, or at least should have considered whether such circumstances existed. But an employee's disagreement with an employer's evaluation does not demonstrate pretext. *Buj v. Psychiatry Residency Training*, 860 F. App'x 241, 245 (3d Cir. 2021). And Plaintiff provides no evidence that such mitigating circumstances existed; although she claims she was not trained on the Line 4 depositor and that she thought Line 4 was "control reliable," Plaintiff has not provided any evidence that those are the kinds of mitigating circumstances that Defendants would consider in determining the sanction for her LOTO violation, nor has Plaintiff provided any evidence that Defendants were required to even consider mitigating circumstances.

Plaintiff next argues that she has presented sufficient evidence from which a jury could find that Defendant Cook's "actions and decisions in her investigation and findings of the incident were racially motivated." Opp. at 15-16. Specifically, Plaintiff says, under the "cat's paw" theory of liability, Defendants can be held liable for Ms. Cook's actions if Plaintiff shows that Ms. Cook harbored discriminatory animus and played a role in the employer's decision to fire Plaintiff. *Id.* at 16. Under the cat's paw theory of liability, "an employer may be liable for employment discrimination if the source of illegal animus was not the final employment decision-maker but rather another employee whose animus proximately caused the adverse employment action at issue in the case." *Mason v. Se. Pennsylvania Transp. Auth.*, 134 F. Supp. 3d 868, 874 (E.D. Pa. 2015). "To survive summary judgment based on a cat's paw theory of liability, a plaintiff must establish (1) a genuine issue of material fact concerning the bias of the subordinate, and (2) a genuine issue of material fact 'as to whether the proffered reason for the employment action is pretextual, which in a [cat's paw] claim requires the plaintiff to demonstrate a causal relationship between the subordinate's actions and the employment decision.'" *Afrasiabipour v. Pennsylvania Dep't of Transportation*, 469 F. Supp. 3d 372, 387 (E.D. Pa. 2020) (quoting *Mason*, 134 F. Supp. 3d at

874)). Defendants say the cat's paw theory is not applicable here because "a necessary predicate is animus between the employee and another individual who thereafter influences the employer's decisionmaking." Reply at 11. Here, Defendants contend, Plaintiff testified that there was nothing prior to the July incident that she felt was discriminatory, so there could be no underlying racial animus as required for cat's paw theory of liability. *Id.* at 12. Plaintiff has indeed presented no evidence that Defendant Cook harbored racial animus toward her or that there is otherwise "a genuine issue of material fact concerning the bias of" Ms. Cook, *see Afrasiabipour*, 469 F. Supp. 3d at 387, so the Court cannot hold that there is sufficient evidence from which a jury could find that Ms. Cook's actions and decisions were racially motivated. [7]

At this point, Plaintiff's only credible argument as to pretext is that Mr. Saad and Ms. Dillow, who may or may not properly be considered comparators, were not terminated following the July 17 incident. Because there is a question of fact as to their culpability for LOTO violations, summary judgment is inappropriate.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is denied. An appropriate Order follows.

[7] Plaintiff makes a brief argument that circumstantial evidence about the employer's history and work practices can be used to show that an employer was more likely than not to have acted from an unlawful motive. Opp. at 17. Plaintiff points to an incident in which an employee used a racially discriminatory word in the workplace and was given a written warning, arguing that this demonstrates Defendant's condoning of such behavior and a discriminatory workplace culture. *Id.* at 18. Without more, evidence of this single incident is insufficient to establish a workplace culture of discrimination so as to refute Defendants' explanation of why Plaintiff was terminated. *See Potts v. Cleveland-Cliffs, Inc.*, No. 22-cv-01653, 2025 WL 1583871, at *11 (M.D. Pa. June 4, 2025).